J-A25019-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MELVIN ORTIZ | : | |
| | : | |
| Appellant | : | No. 2086 MDA 2018 |

Appeal from the Judgment of Sentence Entered June 21, 2018
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0001050-1998

BEFORE:  BOWES, J., OLSON, J., and KING, J.

DISSENTING MEMORANDUM BY BOWES, J.: **FILED: JANUARY 11, 2022**

A bungled robbery resulting in the shooting death of a young father.  No video surveillance, physical evidence, or eyewitness identification testimony.  A state senator's son, his fifteen-year-old pregnant girlfriend, and a jailhouse snitch, who say the seventeen-year-old defendant confessed to them that he did it.  A defendant, with an alibi confirmed by a dozen witnesses, who took the stand and repeatedly proclaimed his innocence.  A guilty verdict.

Fast forward twenty-two years.  The former pregnant-fifteen-year-old recants her testimony.  She now says that her boyfriend admitted to her at the time that he was one of the robbers.  She has no personal knowledge of defendant's involvement.  She lied to protect her boyfriend and destroyed evidence linking him to the crime.

While these facts may sound straight out of a crime novel, they are the facts before us in this appeal. The Majority affirms the trial court's denial of a new trial, holding that Tina Valentin Hiester's recanted testimony likely would not change the outcome of a new trial. I strongly disagree and respectfully dissent. After twenty years on the bench, I believe this is one of those rare cases where recantation testimony compels a new trial.

At the November 20, 2018 hearing on after-discovered evidence, Ms. Hiester testified that the testimony she gave at Appellant's trial implicating him in the shooting of George Clauser was untruthful. She never heard Appellant admit to participating in the robbery. She testified further that her then-boyfriend Caltagirone was involved, that he had her dispose of a mask and hoodie on the night of the murder, and that she had lied for him.[1]

The learned Majority equates the scope of Ms. Hiester's recantation testimony with the defense's cross-examination of her at trial, and

_____

[1] Ms. Hiester testified that she first went to the police in 2005 "and tried clearing her conscience and making this right." N.T. 11/20/18, at 23. She had recently lost her one-week old infant and felt it "that it was God's way of punishing her" for taking the life of someone else's son for a crime he had not committed. *Id*. at 6. No one took her seriously. In 2011, she renewed her efforts after her parents died and she was diagnosed with stomach cancer. She "wanted to get the truth out and the weight off her shoulders and clear my conscience." N.T, 11/20/18, at 12. She called the Reading Police Department and an officer interviewed her. A supplemental police report was prepared one month later, which Ms. Hiester stated did not accurately represent what she told the officer. *See* Defense Exhibit 4. There was no follow-up. It was only in "the past year" that she found someone in Appellant's family through Facebook, who placed her in contact with defense counsel, and the April 24, 2018 affidavit was prepared. *See* Defense Exhibit 1.

characterizes it as simply undermining the testimony of Caltagirone and Melendez. I submit that the scope of Ms. Hiester's new testimony goes far beyond her trial testimony. As the trial court noted, Ms. Hiester's original trial testimony "largely corroborated the testimony of her then-boyfriend, John Caltagirone." Trial Court Opinion, 12/9/19, at 15. Ms. Hiester's new testimony, which the trial court found credible, not only retracted her corroborative testimony, but implicated Caltagirone in the crime. In addition, Ms. Hiester's account bolstered Appellant's proffered alibi.

The Commonwealth's case against Appellant consisted largely of his admissions of guilt to Caltagirone, which were corroborated by Ms. Hiester, Appellant's inculpatory statements to fellow inmate Calixto Melendez, and the eyewitness patron's description of the clothing worn by the two perpetrators, which was similar to clothing worn by Appellant and his brother on the evening of the incident.[2]

At the hearing on Appellant's post-sentence motion raising after-discovered evidence, Ms. Hiester disavowed any personal knowledge of Appellant's involvement in the robbery and murder of George Clauser. She stated that her original testimony implicating Appellant was based solely upon what Caltagirone told her. She reported inculpatory statements Caltagirone made to her the night of the robbery and described her role in disposing of

_____

[2] Appellant's brother was never charged in the robbery/murder.

evidence that incriminated him. She also explained that she had lied at Appellant's trial to protect Caltagirone because they were romantically involved.

Moreover, Ms. Hiester clarified that, although Caltagirone was purportedly working security at a Boscov's store when the crime was committed, he left work that evening. She explained that Caltagirone or his co-worker would frequently leave work after clocking in, and the other would cover, and that was the case on December 23, 1997. In addition, Ms. Hiester described how, on that date, Caltagirone directed her to retrieve a bag he had hidden earlier behind the sofa in the home she shared with her mother. Later that evening, in her presence, Caltagirone removed a hoodie, ski mask, and handgun from that bag and placed the hoodie and mask in two bags. She and Caltagirone drove to the Schuylkill River and, at Caltagirone's direction, she threw the bags into the river. Caltagirone later disposed of the handgun when he went to Delaware. Thus, Ms. Hiester not only recanted her trial testimony, but presented compelling new evidence that Caltagirone was involved in the robbery/murder. Her testimony, if believed, effectively destroyed the credibility of the Commonwealth's key witness, Caltagirone.

Ms. Hiester also confirmed that Appellant paged her that evening, and when she and Caltagirone telephoned him in response, she heard Appellant ask for a ride from a birthday party. During a second telephone conversation with Appellant approximately fifteen to twenty minutes later, Appellant

- 4 -

informed Caltagirone that he did not need a ride as he was staying longer at the party and had a ride. Her fresh account of those conversations thoroughly undercut Caltagirone's testimony that Appellant admitted shooting George Clauser during the telephone calls. Further, it tended to buttress Appellant's alibi that he was at the birthday party when the robbery/murder occurred.

In order to obtain relief based on after-discovered evidence, an appellant must demonstrate that the evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

*Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008). The appellant need only establish these four circumstances by a preponderance of the evidence. *See Commonwealth v. Payne*, 210 A.3d 299, 302-303 (Pa.Super. 2019) (*en banc*) (finding the appellant had established by a preponderance of the evidence that after-discovered DNA evidence would have likely changed the decision of the jury).

My esteemed colleagues find that Appellant met the first three requirements, and I agree. Appellant demonstrated that the evidence did not exist at the time of trial. Furthermore, he established that it was not merely corroborative nor cumulative of other evidence offered at trial, nor offered solely to impeach another witness's testimony. Nonetheless, the Majority agrees with the trial court that the fourth requirement was not met herein,

*i.e.,* that Appellant failed to establish by a preponderance of the evidence that Ms. Hiester's testimony would likely result in a different verdict if a new trial was granted. The Majority finds that her recantation testimony would not undermine the Commonwealth's theory of guilt or hinder its ability to present the same theory of culpability at a new trial. I disagree.

In denying Appellant a new trial, the trial court prefaced its reasoning with the observation that "recantation testimony is inherently unreliable," especially when it involves an admission of perjury. Trial Court Opinion, 12/9/19, at 19 (quoting **Commonwealth v. Henry**, 706 A.2d 313, 321 (Pa. 1997)) (citations omitted). Nonetheless, the court stated that it was "satisfied that [Ms.] Hiester's recantation [was] credible," and that Appellant's "conviction was, in fact, based in part on perjured testimony." **Id**. at 19-20.[3] Despite that conviction, however, the court concluded that Ms. Hiester's recantation testimony was not likely to result in a different verdict if a new trial was granted. **Id**. at 20. The court reasoned that the jury believed her when she lied at trial, and stated "it was just as possible that the jury would again choose not to believe that everything [Ms.] Hiester knows about [Appellant's] involvement in the shooting, she learned second-hand from John Caltagirone." **Id**. at 22. The court also added that Ms. Hiester was not the

---

[3] The court found Ms. Hiester credible despite concerted attempts to impeach her testimony with evidence that she and Caltagirone had been involved in a contentious child custody dispute and suggestions that she was mentally unstable.

only person to testify as to Appellant's involvement; there were two other witnesses, Caltagirone and Calixto Melendez, who also testified that Appellant confessed. *Id*.

In suggesting that the jury might not believe Ms. Hiester, the trial court did not properly view the after-discovered evidence. In determining whether after-discovered evidence would likely change the result of a trial or hearing, "a court must examine the persuasiveness of the new evidence **assuming the fact-finder believes it**." *Payne*, *supra* at 302-303 (emphasis added). This Court held in *Payne* that such an inquiry involves evaluation of "(1) the nature of the new evidence; (2) whether, and to what extent, the new evidence is consistent or inconsistent with other trial testimony; and (3) whether, and to what extent, the new evidence is consistent or inconsistent with documentary evidence." *Id*. (citing *Commonwealth v. Fiore*, 780 A.2d 704, 713-14 (Pa.Super. 2001)).

In *Payne*, this Court cited our Supreme Court's decisions in *Commonwealth v. Bulted*, 279 A.2d 158, 161-62 (Pa. 1971), and *Commonwealth v. Mount*, 257 A.2d 578 (Pa. 1969), in which the Court advocated examination of case-specific factors, such as the prosecution's theory and closing remarks at the original trial, to determine the importance of the new evidence.

Employing that approach herein, I would point out that the Commonwealth's case against Appellant at the original trial rested primarily

on his alleged confessions to Caltagirone, Ms. Hiester, and Melendez. Appellant took the stand in his own defense and denied that he committed the robbery that culminated in the shooting death of George Clauser. He stated further that he had never told these people that he was involved in the robbery and that they were lying. The after-discovered evidence, if believed, confirms that Ms. Hiester was indeed lying, and that Appellant never made inculpatory statements to her, or to Caltagirone in her presence. Furthermore, Caltagirone implicated himself in the robbery in statements he made to Ms. Hiester and enlisted her help in disposing of a dark-colored hoodie and a mask that night. Hence, the after-discovered evidence wholly discredits the trial testimony of two of the three critical Commonwealth witnesses against Appellant.

The importance of the testimony of Caltagirone and Ms. Hiester to the Commonwealth's case is evident from the prosecutor's closing argument. The Commonwealth emphasized Caltagirone's testimony that, shortly before the robbery/murder, Appellant tried to recruit Caltagirone to rob a business or pizza shop with him, and that Ms. Hiester corroborated that conversation. *See* N.T. Jury Trial, 5/24-28/99, at 791. The prosecutor reminded the jury of the conversations Caltagirone had with Appellant on the evening of the robbery, during which Appellant allegedly admitted his involvement and insisted that the gun had simply gone off. *Id*. at 791. Again, he pointed out that those conversations were corroborated by Ms. Hiester, and that they established

Appellant was not at the party. *Id*. The Commonwealth recalled Jeff Gooch's testimony that Ms. Heister told him at the vigil service for George Clauser that Appellant was the shooter. *Id*. at 790, 792. Much was made of the fact that, three days after the robbery, again while Caltagirone was purportedly with Ms. Hiester, Appellant allegedly admitted that he robbed Effie's Pizza Villa, and that he was the shooter. *Id*. at 792. The Commonwealth bolstered the credibility of Melendez, a career criminal, by pointing out that his testimony was corroborated by the testimony of Caltagirone and Ms. Hiester. Although the defense attempted to impeach Caltagirone, the Commonwealth argued to the jury: "The more the defense bangs away on John Caltagirone, the more we are telling you, whose friend was he? Melvin Ortiz'[s]."[4] *Id*. at 796.

Thus, Caltagirone's testimony that Appellant confessed his involvement to him, allegedly corroborated by Tina Hiester, was vital to the Commonwealth's case. Moreover, Appellant's purported confessions lent credence to the Commonwealth's theory that Appellant's alibi was a lie, and that Appellant went to the birthday party early, left to rob the pizza shop at about 7:30 p.m., and then returned to the party.

The after-discovered evidence offered by Ms. Hiester introduced the notion that Caltagirone, the key prosecution witness, was one of the

---

[4] Although Caltagirone testified that he and Appellant were "good friends," Appellant stated that Caltagirone was merely an "acquaintance." N.T. Jury Trial, 5/24-28/99, at 256 and 486.

perpetrators of the robbery and murder. Hence, Caltagirone had a reason to divert attention from himself and implicate Appellant in the crime. There was no fingerprint, ballistics, or DNA evidence. The robbers were not depicted on video surveillance or identified by eyewitnesses. I submit that at a new trial, Ms. Hiester's testimony repudiating her trial testimony and implicating Caltagirone in the robbery and murder would force the Commonwealth to adopt a new theory of the case and trial strategy, even if Caltagirone and Melendez were to offer testimony consistent with their testimony at the first trial.

Appellant offered numerous alibi witnesses who placed him at a birthday party at the time of the robbery. Additionally, the patron who witnessed the robbery testified that he told the lead criminal investigator that he knew Appellant and Appellant was not one of the two men he observed robbing the pizza shop. *Id*. at 246-247. Ms. Hiester's recantation testimony and information linking Caltagirone to the robbery and murder, if credited by the factfinder, leaves the Commonwealth with little evidence of Appellant's guilt but the suspect testimony of a jailhouse snitch and a photograph showing Appellant at a birthday party the night of the robbery/murder wearing light-colored khaki pants and a dark hooded sweatshirt. In my view, that would not be enough to convict.

I believe Appellant's judgment of sentence must be vacated and the case remanded for a new trial. Hence, I dissent.